(No. 4725

RAY FRANKLIN, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed March 26, 1959.*

O'BRIEN, BURNELL AND PUCKETT, Attorneys for Claimant.

LATHAM CASTLE, Attorney General; SAMUEL J. DOY, Assistant Attorney General, for Respondent.

WHAM, J.

This is a claim for $7,500.00 brought by claimant, Ray Franklin, to recover from respondent, the State of Illinois, the amount of money damages sustained by him,

which proximately resulted from the negligent spraying of a weed killing chemical, known as 2,4-D, by and at the direction of the State of Illinois, Division of Highways, along State highway No. 126 adjacent to the tomato field of claimant near Yorkville, Illinois, on the 14th day of June, 1955, resulting in damage to the tomato crop of claimant.

There is little material dispute as to the facts concerning the spraying activities, but there exists a fundamental dispute as to the application of the law to the facts, and the amount of damages proven.

In April of 1955 the State of Illinois engaged one Charles D. McFarland, d/b/a McFarland's Tree Service, to spray weeds along the State highways. On June 14, 1955, Mr. McFarland's spray rig was operating along Route No. 126, between Yorkville and Plainfield, Illinois, at a point adjacent to the tomato field of claimant. The spray concentrate furnished by the State of Illinois to Mr. McFarland was a low volatile 2,4-D ester type mixed with water, and was sprayed at 50 pounds pressure at a height of approximately two feet above the ground. No part of claimant's tomatoes were directly sprayed, nor did the spray in its initial application carry across the fence into the tomato field.

On this day of June 14th the tomato plants were in the stage of first bloom, were stocky with large main stems and excellent vine growth. Following the spraying, the entire tomato acreage appeared to be uniformly damaged. On June 15th the plants were drawn up, the foliage was severely distorted, and the vines gave the appearance of constriction of growth. The plants on inspection had all the characteristics of 2,4-D damage.

Claimant's witness, Wayne Robbins, pathologist and

geneticist for the Campbell Soup Company, testified that the 2,4-D spray material would volatize at 90° temperatures for at least a week subsequent to the spraying. The toxic ingredients would then drift with the wind as a vapor, and be as effective as if sprayed directly upon the vines. This witness testified that he inspected the field three days after the occurrence of the spraying incident, and gave his opinion that there had been a strong application of 2,4-D to the tomato plants, and that it could have been caused by spraying adjacent to the field, which revolatized, and was carried over the field by the wind. This witness qualified as, and was conceded by respondent to be an expert in his field. Respondent also conceded that 2,4-D is generally injurious to tomato plants.

It is respondent's position, however, that these facts fail to establish negligence on the part of respondent, inasmuch as there was no direct spraying of claimant's field, nor do the facts establish that respondent should have foreseen that the spray would revolatize, and later drift upon the land of claimant. Respondent points out that there was no evidence offered as to the temperature at the time of the spraying or any time thereafter, and that, therefore, claimant has failed to offer sufficient evidence to establish that the 2,4-D revolatized in the manner stated by Mr. Robbins, or that respondent should have foreseen such a result.

Respondent correctly states that the burden is on claimant to prove his case, but we feel that, in determining whether or not the burden has been discharged, we cannot close our eyes to the circumstances, probabilities, and legitimate inferences, which arise from the facts proven by the evidence.

The evidence clearly establishes that the crop was uniformly damaged by a strong 2,4-D solution, and such damage manifested itself the day following the spraying operations. Mr. Franklin, claimant, testified that he had not sprayed his field, and that none of his neighbors had sprayed after his tomato plants had been planted.

The evidence to the effect that the spraying was conducted in the middle of June on a windy day, when taken in connection with the other evidence heretofore narrated, seems sufficient to us to establish a causal connection between the spraying by the State and the damage to the plants of claimant, even in the absence of testimony pertaining to the exact temperature of the day.

As to the question of negligence, we believe that the State should have known of the volatile nature of this spray, and the probable results of its use, if in fact they did not know, by conducting an investigation, inquiry and tests before using it in the vicinity of a tomato field. If inquiry had been made, the information known by claimant's witness Robbins would have been known by respondent prior to the occurrence in question.

It was conceded that the State knew of the spray's damaging qualities when applied to tomato plants. The State, therefore, owed a duty to claimant to refrain from spraying along the road when it was reasonably foreseeable that the spray would revolatize and drift onto claimant's field. Consequently, we feel that claimant has borne the burden of proof on the question of negligence and proximate cause.

It goes without saying that the question of due care on the part of claimant is not a problem. The evidence sufficiently establishes that he was in the exercise thereof at and prior to the occurrence in question.

As to the extent of the damages, we must also utilize inferences that arise from the basic facts in order to come to a conclusion on the amount. Admittedly, this type of cases presents considerable difficulty in arriving at a precise amount of damage, since seldom, if ever, is there definite proof on this question.

Claimant and the Campbell Soup Company had entered into a contract covering the 1955 crop, wherein claimant agreed to sell, and the Campbell Soup Company agreed to purchase the entire crop at a price of $35.00 per ton for Grade No. 1 tomatoes and $23.00 per ton for Grade No. 2 tomatoes.

The estimated yield of claimant's 1955 crop on June 14th, as testified to by claimant's witnesses, was 16 to 17 tons per acre. The evidence with respect to the number of acres planted varied from 54.3 acres to 61 acres. The burden being on claimant, and there being no more reason for accepting one set of figures than the other, we find that the estimated yield was 16 tons per acre, and the acreage planted was 54.3 acres, and, therefore, the total estimated yield was 868.8 tons.

The evidence established that claimant's field produced 71% Grade No. 1 and 27% Grade No. 2 tomatoes for an average of $30.08 per ton. Claimant contends that the average crop in the area was slightly higher for grade No. 1, but the evidence does not establish any basis upon which to find that the spray damage caused claimant's crop to have a lesser percentage of grade No. 1 tomatoes. Therefore, we find that the average contract price for claimant's tomatoes was $30.85 per ton.

The evidence established that the harvesting and marketing expense, including hamper rental, trucking tomatoes to Chicago, and picking the tomatoes was

$12.68 per ton, thus leaving a net loss basis per ton on unmarketed tomatoes at $18.17.

Claimant contends that the number of tons lost by reason of the spray damage was seven tons per acre. This he arrives at from the testimony of his witnesses, Wayne Robbins, who estimated the loss at the time of his inspection of the tomato field on June 17th, three days after the spraying, and Sylvester P. Browning, crop supervisor for the Campbell Soup Company, who inspected the field as late as July 16th.

From claimant's evidence it appears that the type of damage, which a spraying of the plants causes, is delay in maturity, restriction in growth, and, as claimant stated, ''The field just stands still after a shock like that. They don't go ahead with its natural growing and all. It stands for a while.''

The most satisfactory proof of this damage would have been to take the difference of the expected yield and the actual yield, which in this case was established as 5.6 tons per acre, or a total of 304.08 tons.

Unfortunately, however, a severe hail storm occurred on July 23, 1955 after the spraying damage occurred. This complicates the situation, and prevents arriving at the loss in this manner.

However, the hail damage can be gauged to a fair degree of accuracy in view of the fact that an insurance appraisal forming the basis for a $6,837.00 adjustment was made on the loss occasioned by the hail. Converting this figure into tons per acre at $18.17 per acre reflects a hail loss of 376.207 tons.

Obviously this loss could not be attributed to spray damage, and a total of the tons harvested plus the tons lost by reason of the hail damage would be a fair ap-

proximation of the total yield after the spray damage occurred. This amounts to 680.287 tons. The difference between this figure and 868.8 tons, which was the estimated yield at 16 tons per acre prior to the hail damage, leaves a total of 188.513 tons lost by reason of spray damage. Converting this figure into dollars at $18.17 per ton equals $3,425.28 total damages.

This appears to us to be a far more accurate method of arriving at the amount of damages resulting from the spraying of the tomatoes than the method urged by claimant. It also is more accurate in our judgment than by comparison of ultimate yield with other fields in the area, inasmuch as there would be no way to compare the extent of hail damage on two tracts of land though located in the same general vicinity.

Claimant contends that the hail damage of July 23, 1955 should not be considered in arriving at the damage to the crops, since it occurred subsequent to the spray damage.

In our judgment, as we have heretofore stated, it is proper to refer to the hail loss in the process of ascertaining the value of the crop immediately following the spray damage, and the value of same at the marketing season. This seems to us to be in accordance with the rule announced in *Scanlan* vs. *Musgrove*, 91 Ill. App. 184 at 186, relied on by claimant, which rule is stated by the court in discussing the value of damaged, immature crops, as follows:

"and this value may be properly ascertained by showing the probable amount of wheat the crop, as it appeared when destroyed, would likely yield; the value of the same at the market season, and deducting therefrom the necessary cost for harvesting and threshing the same."

As the rule is stated in *Illinois Law and Practice*, Vol. 15, Sec. 43, Damages, at page 537:

"The true value of a growing crop must be arrived at from a consideration of numerous facts, including the condition and quality of the soil, the nature of the crop, its probable yield, the hazard of maturity, the kind of crops the land will ordinarily yield, and the expense, which would have been incurred after the injury in transporting the crop to market."

It seems clear to us that the hazard of maturity could be no more accurately established than by the evidence in this case concerning the appraised damages resulting from the hail loss by the same insurance company charged with paying for that loss.

Moreover, the obvious result of ignoring the hail loss would be to compensate claimant by the State for damages not caused by the State. This we will not approve.

The claim should be allowed not in the sum of $7,500.00 as claimed, but in the lesser sum of $3,425.28, which we feel the evidence has fairly established as the amount of damage caused by the negligent spraying operation conducted by the State of Illinois. The claim is, therefore, allowed in the amount of $3,425.28.